## STERLING OIL & REFINING CORPORATION v. ISBELL et al.

### No. 9625.

Court of Civil Appeals of Texas. Austin.

April 16, 1947.

Rehearing Denied May 7, 1947.

W. M. Cleaves and E. E. Townes, both of Houston, for appellant.

Price Daniel, Atty. Gen., and W. V. Geppert and C. K. Richards, Asst. Attys. Gen., for appellee.

BAUGH, Justice.

This suit was brought by appellant under the provisions of Vernon's Ann.Civ.St. Art. 7057b, against the Secretary of State, Treasurer, and Attorney General of Texas, to recover $9,348.32 in franchise taxes and penalties for the years 1936–1946 exacted of appellant by the Secretary of State and paid under protest. Trial was to the court without a jury and judgment rendered against the corporation; hence this appeal.

The controlling facts are stipulated. The case arose as follows:

The corporation was originally chartered on March 31, 1933, as the Miramar Corporation with a capital stock of $100 divided into 10 shares of the par value of $10 each. On May 23, 1933, it amended its charter so as to change said stock to 80 shares of the par value of $1.25 each. In August, 1934, it again amended its charter changing its name to Sterling Oil & Refining Corporation, and its capital stock to 80,000 shares of no par value stock all of the same class. At that time the 80 shares of par value stock appear to have been owned by 22 individuals. The first

40,000 shares of the new no par value stock were subscribed for and issued to the holders of the 80 shares of said par value stock in proportion to the number of the par value shares held by each (that is, 500 shares of no par value for each share of $1.25 face par value), and were paid for by the surrender and cancellation of said 80 shares of such par value stock. The other 40,000 shares of no par value stock authorized by said charter amendment, but not then issued, were apparently based upon a cash surplus in the corporation's treasury of $46,693.25, of which $20,000 was contributed by the stockholders; and the further fact that the net value of the assets of said corporation at the time of said amendment was far in excess of the $25,000 minimum required to be paid in by Sec. (d) of Art. 1538d, Vernon's Ann.Civ.St.

In making the necessary proof to the Secretary of State for such charter amendment, four of the directors of the corporation made the following sworn statement:

"That the value of the 80 shares of $1.25 par value stock so paid in to the corporation by the several parties hereinabove named, and as hereinabove set forth, as consideration for the said 40,000 shares of no par value stock as such value is evidenced by the net value of the assets of the corporation as hereinabove particularly set forth and described, is $1,033,181.25; and which sum of $1,033,181.25 is the cash value of said consideration."

It was also shown that when said amendment was filed with the Secretary of State each of the 80 shares of the par value stock so surrendered and cancelled had an appraised cash value of $12,914.765. Further, in response to a demand of the Secretary of State, said corporation filed its franchise tax return for 1934 showing its capital stock as being $1,033,181.25 and paid its franchise taxes for 1935 on that valuation. For all subsequent years, however, its franchise tax returns showed its capital stock as $100 for the 40,000 shares issued to the 22 stockholders in lieu of the 80 shares originally held by them, plus the value actually received for such of the 40,000 authorized shares as were thereafter issued and sold to the public. The value of such authorized and subsequently sold shares was not fixed in the charter amendment. Presumably such value was fixed by the directors of the corporation pursuant to the provisions of Art. 1538c, Vernon's Ann.Civ.St. In any event, the report made by the corporation to the Secretary of State in May, 1945, showed that during the years 1934 to 1942, there had been sold an aggregate of 30,610 of the authorized 40,000 shares, for which the corporation had actually received $25 per share.

The sole question here presented for decision is whether, for franchise tax purposes, the 40,000 shares of no par value stock issued to the holders of the 80 shares of $1.25 par value stock in consideration of the surrender and cancellation of said 80 shares, should be valued at $100; or whether they should be valued at $1,033,181.25, the cash value then placed by the directors upon said 80 shares when they were surrendered and cancelled. The State contends, and the trial court held, that the valuation should be $1,033,181.25. No cases have been cited to us nor have we been able to find any bearing directly upon the issue presented.

The no par value corporation was not authorized in Texas prior to the Act of 1925. R.C.S. Arts 1538a to 1538m. That Act provides that where a charter, or an amendment to a charter, is sought, which authorizes the issuance of no par value stock, the majority of the directors must file with the Secretary of State a certificate showing "the number of shares without * * * par value subscribed and the actual consideration received by the corporation for such shares." Art. 1538d. Likewise the filing fees provided for in said Act are based upon the "actual consideration received by the corporation for any such shares issued * * *." Art. 1538f. And Art. 7084, the franchise tax statute, provides that "For the purpose of computing the tax of corporations issuing no par stock, such stock shall be taken and considered as being of the value actually received at the time of the issuance thereof; * * *."

What then was the "actual consideration received by the corporation" for the issu-

ance of said 40,000 shares? Appellant contends that in so far as these first 40,000 shares are concerned the corporation reveived nothing additional to the assets it already had. That it received no property because it already owned the property on which the value of such shares was based. Further, that the owners of the 80 shares of par value stock paid nothing new to the corporation, and added nothing to its capital assets, but merely converted a small number of shares, with an appraised value, into a much larger number of shares, of the same aggregate value, each of which shares whether of the 80 par value or of the 40,000 non-par value issue, merely evidenced the holder's beneficial interest in the assets of the corporation.

■ If this contention be true then there would have been no consideration for the issuance of the original 40,000 no par value shares. Such a contention contradicts the express representation of the directors themselves to the Secretary of State in order to secure the amendment. Obviously such an amendment to its charter conferred upon the corporation a valuable right in permitting it not only to change the character and number of the par value shares from 80 to 40,000; but by enabling it to sell an additional 40,000 shares to the public at a price fixed in 1934 at $25 per share. The conversion, if it be merely so considered, of the 80 shares into 40,000 shares, was not merely a matter of form or of a paper change; it was inseparably linked with the authorized issuance of another 40,000 shares of no par value stock. The consideration contemplated by said law for the issuance of such original 40,000 shares, plus the authority to issue another 40,000, is indivisible. There were subsequently issued of those authorized an additional 30,610 shares for which the corporation actually received in cash $762,377.25 and on which it actually paid franchise taxes. Though the amendment does not fix the value of these additional authorized shares, it does expressly provide that "each and every share of which 80,000 shares no par value stock shall be exactly similar and of the same class as each and every other share of said 80,000 shares of no par value stock." Yet to sustain appellant's contention would

be to hold that for franchise tax purposes the first 40,000 shares of such no par value stock should be valued at only $100; and the subsequently issued 30,000 shares of such stock "exactly similar and of the same class" valued for the same purpose at $750,000. Obviously the two issues, for tax purposes, must fall into the same category and be valued alike. Such is the purpose and intent of the law; and was, we think, clearly recognized by the corporation's directors in procuring such amendment. Art. 1538g provides that the valuations fixed by such directors in their certificate are for the purpose only of enabling the Secretary of State to "compute the *filing fees and franchise tax* to be paid upon said shares * * *." (Emphasis ours.) Thus both charges against the corporation are to be computed on the same basis. And Art. 1538f(b) expressly provides that, for filing fee purposes, shares not subscribed and paid for at the time of filing such amendment shall "be assumed to have the same value per share as that for which the shares actually subscribed and sold were issued." If appellant's contention then be applied as the law provides the corporation's franchise tax under its charter amendment would be computed on a valuation for all of said 80,000 shares of stock of only $200, when, if all of the second 40,000 shares had been issued the appraised value would have been at least two million dollars. Since a franchise tax is but "a charge made by the state against the corporation for the privilege granted it to do business in the state"; and it is the purpose of the law to exact such a tax *commensurate* with the *value of such privilege so granted* (see United North & South Development Co. v. Heath, Tex.Civ.App., 78 S.W.2d 650, writ refused), the purpose of the law would be almost entirely defeated by applying appellant's construction.

■ It seems clear, therefore, that for franchise tax purposes, the "value actually received" by the corporation for the 40,000 shares of no par value stock issued to the holders of the original 80 shares of par value stock, which were surrendered and canceled, must be deemed, as originally represented by the directors in order to secure such amendment, to be the actual

value of such shares of stock. To hold otherwise would be, in effect, to approve their issuance, and a material alteration of the corporation's capital structure, without any consideration to the state for the additional privilege so granted, and so defeat the purposes of the franchise tax statutes.

It follows, therefore, that the judgment of the trial court should be affirmed, and it is so ordered.

Affirmed.

HUGHES, Justice (concurring).

Art. 1538a–1538m, authorizing the issuance of non-par stock by corporations, applies to amendments of existing corporate charters, as well as to newly created corporations. 1538a and 1538d.

Sub-section (d) of Art. 1538d provides that at least 10% of the non-par stock shall be, in good faith, subscribed and paid for by the stockholders of the corporation before the corporation shall be chartered or have its charter amended so as to authorize the issuance of non-par stock and "provided further that in no event the amount so paid shall be less than $25,000.00."

If appellant had informed the Secretary of State at the time the charter amendment was applied for that it received nothing (or at most $100) for the 40,000 shares of non-par stock issued in lieu of the outstanding 80 shares of stock of the corporation, as it now asserts, then the charter amendment would have been unauthorized under the provisions of the statutes above noted, and undoubtedly the Secretary of State would have refused to approve the charter amendment. If we should now hold in accordance with appellant's contention the necessary result would be that the charter amendment, being unauthorized by law, is null and void, and all transactions made by the corporation under such charter amendment were invalid, including the sale by the corporation of more than three-quarters of a million dollars of the non-par treasury stock, the issuance of which was also authorized by the charter amendment.

Appellant does not ask that the amendment be nullified and the former status of the corporation restored, and no opinion is expressed as to what decision would be made under such circumstances. Appar-

ently appellant desires us to hold that the transaction was illegal in so far as its liability for taxes is concerned, and valid for all other purposes. This no court should do.

Appellant has not in any manner been misled by the Secretary of State. From the very first, franchise taxes have been demanded on the basis that the consideration actually received by the corporation for the issuance of the 40,000 shares of non-par stock was $1,033,181.25, as represented by appellant. In fact appellant paid on that basis the first year following the charter amendment. With full knowledge, then, of the position of the Secretary of State, appellant continued to conduct its affairs as if the charter amendment were valid, only that it refused to pay its franchise taxes on such assumption.

Under these facts appellant is conclusively bound by the representations made to the Secretary of State at the time its charter was amended that it actually received $1,033,181.25 for the issuance of the 40,000 shares of non-par stock to the stockholders of the old corporation.